Good afternoon. I am Justice Aurelia Paczynski and you are in the First District, First Division of the Illinois Appellate Court. We are hearing today case number 1-21-0676, Carlos Pike, Plaintiff Appellant v. ABSS Manufacturing Co. and Sunset Ladder Co. Defendants Appellees. With me today are my colleagues, Justice Michael Hyman and Justice Mary Ellen Kotlin. I'll ask the speaking attorneys for each side to introduce themselves and then we'll start with the plaintiff, but first introduce yourselves. Good morning, Your Honors. Dennis Lynch for the Plaintiff Appellant. Thank you. Good afternoon, Your Honors. Katherine Weiler on behalf of the defendants. Okay. Our normal routine is, you know, 10 or 15 minutes for the appellant, 10 or 15 minutes for the appellate. We might ask some questions. We try not to break into your train of thought at the beginning. But I would like to point out, we have read the briefs. We have read the record. We're familiar with the case. So our advice always is to start with your most important point, with the best point that you can make and go out from there. So with that, I think we're dealing with Mr. Lynch. Yes, Your Honor. Okay, so go for it. Thank you, Your Honor. May it please the court. With Your Honor's admonishment in mind, I think this is a fairly straightforward case. This is a strict products liability case under the theory of a nonspecific defect, which was recognized in our Supreme Court long ago in Tweedy. And these sorts of cases really get at the heart of what strict products liability is and is meant to be. It's a consumer protection law. It's a law that's meant to protect the public and users of products from those products failing. You know, products should work as they are intended. And ladders that are only two years old shouldn't collapse. But the ladder had a warning, which the plaintiff did not read. And he was 50 pounds over that warning. And so isn't that abnormal use? It's not, Your Honor. As the defendants admitted in deposition testimony, this ladder should have withstood a 500 pound man. But that's not the point. The point is that the warning is for 300. Under that theory, then, if they wanted to say 300 pounds, they'd have to say this ladder is only fit for somebody 100 pounds, right? So that's not the law. The fact that a 900 pounds is fine, but that's not what the warning says, 350. 300 and 350. This is because under certain standards and whatever they followed, it should. But their warning says 300. And I don't know of a case. Do you know of a case where it said that, because there's a regulation, not a regulation, but an association or some kind of standard in the industry, that that's where you go. You don't go into what is recommended on the product. You know, first answer that whether there's a case. I don't have a specific case to address that, Your Honor. I do think there is an issue of the premise of your question, which is that the plaintiff did testify. He weighed about 300 pounds, 305. And that testimony alone creates a fact question. Wait, wait, wait. The medical records contradict that. They contradict that, but that's a fact question. He testified. I mean, just because a fact is contradictory. Right. So you say that there's a fact question with regard to his weight. And if it shows that it's 350, then you lose? No, I still don't think that's misuse or abnormal use of a product. And why do they have disclosures like that? Why would they say any product says this product should not be eaten and somebody eats it? Well, you were warned not to eat, but people can eat it. But if you eat enough of it, you can get really sick. Well, again, from a fundamental standpoint, I think that would only impact a failure to warn claim, not the strict products claim. I'm sure Your Honor is familiar with the engineering hierarchy. The first thing you do with a danger is you build it out. You make a product that doesn't have a danger. The second thing you do is you guard against that danger. And the third and last thing you can do, if it's the only thing you can do, is you warn against it. So, again, products are supposed to work as they're intended to work. They're not supposed to collapse. They're not supposed to break. So just that you put a warning up doesn't mean that that makes your product safe under all scenarios. But the question is, under the law, whether that's an abnormal use. And even your expert could not say that it was not abnormal. But he also didn't say that it was abnormal. Right, so therefore your expert doesn't give us any help on this at all. Right, but the defendant gives us help on it by saying it shouldn't collapse if a 500-pound man uses it. That's not what they said. I don't think that's obvious. I think it is, Your Honor. If you can give me a moment. Sure. Yeah, if you look at page 1454, 1455 on the record. Actually, I guess it's really only on 1455. It's up to 900 or 1200 pounds. Yes, absolutely. So if a 300-pound guy walked on that ladder, it shouldn't fail. Yes. If a 370-pound bike, 75-pound guy walked on that ladder, onto that ladder, it should not fail. Correct? Correct. On page 74, in fact, it may hold a 500 person on it if it's properly set up with no damage to that. Correct? Yes. And that's what I've seen as built-in. That's all on page nine of your brief. Correct. So, you know, that's the intention of this product is that it will hold an individual that, you know, exceeds the weight capacity on that sticker. And to Your Honor, Justice Hyman, your existing question, I do believe there are cases that talk about the foreseeability of products being used beyond their strict specifications. That even though, you know, a product may be designed for a nine-year-old, it's foreseeable that it would be used by a 10 or 11-year-old. And I don't have any of those cases at the tip of my fingers right now. But I do think that's recognized in the law that just because we slap a sticker on something that says it can only be used by someone that's 300 pounds, that has to be, you know, can't be used by someone that's 350 pounds, that wouldn't be foreseeable. And again, as a basic tenant of summary judgment, there is a fact question as to whether or not he weighed, you know, 300, 305 pounds. So, you know, this is a summary judgment case. All questionable questions of fact have to be submitted to the jury and not to, you know, the trial court to rule on. So, I think we've made a case under Tweedy. I think that the issues in this case are that this was a ladder that should have been able to contain, that a person 300 and 350 pounds should be able to use. There was no evidence of any previous problems with the ladder. In fact, it had been used for about an hour before with no issues. And that witness, Mr. Brown, had said he inspected it and found no cracks or issues or problems with it. There was no evidence from the owner of the ladder that it had any previous problems. If we disagree with your, you rely on Gillespie and Togeski, I mispronounced that. If we just disagree that those cases apply here, that they're distinguishable, do you still lose or what would your argument be then? I think this is a case of a nonspecific defect recognized by Tweedy in those cases. You're correct. There's not been a specific defect identified, nor does I believe there has to be under Tweedy and its progeny. It's a nonspecific defect case. And again, this gets at the heart of strict product liability law, which is the products have to work as intended. And this ladder, which, you know, a two-year-old ladder in a commercial setting is not an old ladder. There was no evidence of any wear and tear to it or any defects that were apparent from inspection. There was evidence. I thought the testimony was that it looked like a ladder that's been used for like two and a half years. It had wear and tear for a two and a half year old. It wasn't new. There's a case where it was a new ladder. This was not a new ladder. It was two and a half years. Right. But two years in the context of a commercial ladder is not an old ladder. Is that in the record? I don't know what an old ladder would be in the commercial context. I don't believe it was specifically testified to, but I think that's an inference that can be drawn. I don't know how because this could be used every day. Chicago is a very busy place for exhibits. And the testimony was that there are a lot of people like Mr. Pike who are standing on these ladders. There's testimony that this was the electrician's ladder from the electrician's storage space. There was also testimony that there was a team ladder for carpenters. We don't know. There's no testimony about why Mr. Pike didn't go get one of the carpenters ladders. Why was he using the electrician's ladder? Just because it was there and he didn't feel like walking on it? It was there and already set up. Essentially, Mr. Brown needed some additional work performed in order to finish his work. And as you know, the trades have to stay in their lanes. So Mr. Pike had to complete that next step of the work. I'm just curious. I didn't see any place in the record. Maybe I missed it. So Mr. Pike was there as part of a couple-man team putting up this specific exhibit that looks sort of like a fruit stand. And that included a soffit with mouse holes for the electric to go through and also I guess lights. So would we know from the record whether he had used that same ladder to create the hole? He's the carpenter. So he's the guy that cuts the holes. Yeah. Would we know whether he used the same ladder five minutes before this accident to cut the holes or an hour before or the day before or whatever? Is that in the record? The record is silent as that particular issue, Your Honor. I mean, what we can glean from the record is that this was a Freeman ladder. I think Mr. Pike had offered that individual his ladder and Mr. Brown said, no, no, I need to use our own. So I think the inference to be drawn is that he had not used this ladder before. And that it had been used by the Freeman people previously. So from that, we know that this time, instead of saying, no, no, I need to use my own, he did use the electrician's ladder. Right. It was the electrician that originally had said he needed, or it was Mr. Brown who had said he needed to use a ladder from his own company. Mr. Pike previously offered him his own ladder. And then since that ladder was already set up, used the ladder that was already set up. Wait, the ladder that was set up was not the carpenter's ladder, it was the electrician's ladder. Is that right? Correct. Okay. It belongs to Freeman. It belongs to Mr. Brown's company. Right. So we don't, but we don't know if when Mr. Pike, the plaintiff here, was doing the, say the day he started the carpentry work on this exhibit. We don't know whether he was using an electrician's ladder or a carpenter's ladder, but we know that carpenter's ladders were available to him. Correct. Not only any time before this incident, but at the time of this incident. Correct. I think as to that particular question, the record's unclear whether he'd used it before, but there were ladders from his company, his trade, available to him. And we don't know anything about those ladders. Correct. We don't know their weight limits. We don't know their use. We don't know nothing about them. Correct, Your Honor. Okay. With regard to abnormal use, your expert, Mr. Newquist, he agreed, and this is a quote, Pike should not have used this ladder if he weighed 350 plus pounds because the ladder was rated only for 300 pounds. That was his testimony. I think that was also in the context of the fact that he was not trained to use the ladder, and that part of that training would have been on the weight. I believe Mr. Newquist testified he didn't criticize Mr. Pike for using it because he hadn't been trained, so he would not have been trained. I don't know about that. I mean, he also said, Mr. Newquist said that it would be overload for a 350-pound person to use a ladder, and this is a quote, because that's what, because of the 300 pound, is what the manufacturer made it to handle. That was his testimony, so he's testifying very clearly that no one over 300 pounds should be on that ladder. But not that it should collapse. Well, I mean, but that's not the issue. The issue is whether it's abnormal use or not. Respectfully, I would disagree, Your Honor. You know, you're not supposed to roll your SUV, but if you do, and the roof crushes in, it's still defective. It's not supposed to crush and harm you just because you might have been speeding and roll your SUV. That's still actionable under strict product liability. So even if we, even if he wasn't supposed to use the ladder because he's over the weight status, that doesn't mean it's supposed to collapse on that. That's not what's intended, and that's what Mr. Becknell testified to. Those are admissions of the defendant as to what that ladder should be able to withstand. But you have a burden to show there was no abnormal use. Yes. And I don't have any testimony, what testimony do you have of that? No, there was no abnormal use. Well, I think we have some testimony that Freeman had used this ladder without incident. And again, you have Mr. Brown's inspection that there's no cracks, there's no visible problems. He was comfortable using the ladder after an inspection. I don't think you can put a burden on plaintiff to account for a product for every, you know, hour of its life. If there isn't any visible defect, if there's no cracks, if there's no problems with the ladder before this, I don't think you can put that burden on a plaintiff that his claim isn't actionable just because he happened to use a product that he hasn't, you know, had in his possession. Mr. Lynch, what is the point of having a weight limit on there, according to you, makes no difference at all? Well, I think the weight limit provides some guidance. But again, why do you need it under your analysis? May as well say 10 and then a thousand pound person. I mean, I think I understand your honor's question. I think it's a matter of best practices, but we still have to look at what's this ladder built for? What do the industry standards say it has to hold? And that's why I go back to Mr. Newquist's testimony about Mr. Pike not being trained to use ladders, you know, that that would have been covered by the training. Isn't the best evidence of that what the manufacturer says that it's designed to hold? Well, I think the manufacturer here has testified it should have held a 900 pound man. You know, a 500 pound man. It could have, but it's designed for someone 300 or less. That's the duty rating, yes. Right. So, and the manufacturer was testifying about the ANC rules and the OSHA rules. So they're aware of them, but they also, I was just curious about this. They also, we also, there was also a large discussion about the testing of the ladders at the company. And the ladder was designed in 2013 and manufactured in 2013 and sold to Freeman in 2013. And then ANSI requires an initial evaluation of the product design, and then also requires the producer shall monitor periodically. And you were, I thought you were trying to make the argument that nobody tested these ladders at the manufacturer after that, but that's not exactly true because there's also testimony that Ahmed, Mr. Ahmed, kept the ladders that he tested for all. And there was, and had an inventory of them. And so there's evidence that the company did perform, monitor, monitor periodically those, those ladders. Well, so I think they did test them. There was, there was evidence that there was testing in 2004. There was evidence that there was testing in 2017. There was general testimony that there were lots of ladders tested generally without any specific testimony as to this ladder or this batch of ladders. And specifically in the record on 2456, again, the defendant admitted as far as the real details, I don't at this time have them as to what testing was performed. And, you know, most importantly, there's no documentation of that testing that is present that could show that it was actually tested and what weights it actually withheld. So that again, I think creates the inference that there was no testing or that that the results of that testing would be inverse to the defendant. So, you know, if you're doing testings, you're recording testings the fact that they just have a warehouse full of ladders of unspecified time and specifications that they say they tested and have no results, you know, I think further emphasizes the fact that there was no testing done and that these ladders would not withstand the weights they were meant to withstand. No, I'm not sure I agree with that interpretation of that testimony. I mean, the testimony is clear that Mr. Ahmed kept the ladders he tested. So, but not specifically that it was of this batch or of this of this type, you know, that certainly I think we all would agree that if they had tested ladders from this batch, there'd be some evidence of them and some witness testifying that they had or that they'd found an identical ladder in the warehouse that that evidence isn't present in the record. And again, it's a summary judgment case, the jury can infer from the fact that there's no record of any testing and there's just this broad testimony about testing and a concession that he doesn't really have the details that there was no testing done. Unless there's any other questions, I would just... You have the burden, don't you, to show there was no reasonable secondary cause for the injury? No reasonable secondary cause, yes. Okay. And your expert testified that undetected damage of the ladder could have impaired the load bearing integrity of the ladder, correct? He did. And he didn't test the ladder at all? Correct. So, with that in mind, how can you show or meet the requirement that there be no reasonable secondary cause of the injury? It seems to me there could be secondary causes and you haven't met your burden. What's your response? I think the testimony that, again, there were no visible cracks or defects to the ladder, the fact that it had been used immediately prior to Mr. Pike without incident, the fact that Mr. Pike, the testimony is that he used the ladder correctly, had both hands on, etc. He wasn't jumping it, wasn't leaning, etc. It had been used safely in the past. He was using it safely at the collapsed, it cracked before he fell off. I think, again, I think it's an unfair burden on a plaintiff to say you have to have had this product in your possession 24 hours a day, seven days a week, since it was manufactured to rule out every other potential cause when we have the evidence that there was no visible cracks or defects and he was using the ladder correctly. And when we have this evidence that there was not testing done. Is there any evidence, I'm sorry, again, I'm flipping through these pages quickly, but I can't find it. I don't recall if or where anybody said how much Mr. Brown weighed. I believe he testified he weighed about 230 pounds. Yeah, I know it's somewhere in here. That's my recollection too. So, of course, under the white standard on the label, Mr. Brown wouldn't have had any trouble. Correct. Mr. Brown, it's the day that he's going to install the electricity, so he's up and down, up and down on this ladder. He's not having any problems. And then all of a sudden, somebody who's 50 pounds over the limit steps on it and it cracks. Well, two things. One, there is a fact question as to what Mr. Pike's weight was. Secondly, if indeed the theory is that this ladder had some other structural problem, then it could have collapsed under Mr. Brown's weight, even though he's less than 300 pounds. So I think the fact that Mr. Brown was able to use it without incident shows that there was not any previous issues with this ladder that would have been a problem. It is an issue of a fact question with respect to the weight of whether the client was 300 pounds. I know that he testified that he was under 300, I think. Is that what you're referring to? He testified I think he was 300 or maybe 305 pounds. And I know there's medical records that say he's 350, but that's no different than one driver saying there's a red light and one there's a green. That's still a fact question that has to be submitted to the jury. I'll hand it to you. When did he say that he was 305 pounds? Is that a deposition testimony? And again, what was his specific response? I don't recall that. I think it was under 350, but I can't recall his exact testimony. I'm not sure, Your Honor. I can try and- At least two of us. I can try and double check. I know it was under 350. Yeah, I can try and double check and come back to you- That's okay. I can find it. But I know it was under 350, but that's what you're- I thought he said 300 or 305, but- I know it was significantly different. What he said was different than what your brief says. Your brief says on page four, Tyke, who weighed 350 pounds, so are you sort of already agreeing that it was 350 pounds? How does it- There's no question of fact. There's no question of fact? I'm sorry, Your Honor. I cut you off. I spoke over you. I'm just saying you've got two different- you have sort of, I think conveniently, used two different weights for him in your brief. In the nature of the case, you say 350, and then in your statement of facts, you say over 300. Well, that could include 350. And you're trying to make that a question of fact, but I'm saying I don't think it's a question of fact because you've admitted in your statement of nature of the case that he weighed 350 pounds. So how does that convert that into a question of fact? Well, I think that- Summary judgment. The testimony in the record still is that he weighed about 300. But that's not her point. Justice Pachisky's point is that if you made an admission against interest in your brief, we take that as being- So wouldn't that just automatically defeat that part of the argument? You're saying that it should go- it should not be summary judgment because there's a question of fact. That's the question of fact that you have identified. And I'm saying you admitted he weighed 350 pounds. So that takes away the question of fact. So what else have you got? Well, I think there's some evidence that he weighed 350. I think there's some- Besides the weight. What else are you- I think that even if he weighs 350, as there's certainly evidence that he did, I think that's still a foreseeable use of this product and a use of this product that should- that this product should be able to withstand- easily withstand that weight. And you want that to be the question of fact that defeats summary judgment. I think that's the primary situation here. Absolutely. Anything else? That's all I have for right now. Any other questions? Ms. Weiler. Good afternoon, Your Honor. Sorry. Justice Patinsky, I hope you gave me the green light on that. I apologize if you didn't. I did. But I was speaking quietly, so my fault. Good afternoon, everyone. May it please the court. My name is Katherine Weiler. I represent the manufacturing company and Sunset Ladder in this appeal. I want to start with a point that plaintiff's counsel raised several times during the course of his argument. And that's the idea that products should work the way they're intended to work. And that's true. But Justice Hyman, as you were very quick to point out, that doesn't mean that just because a product doesn't work the way someone anticipates it should work, that there is liability. And that's the point of the strict liability case law in this state. Illinois adopted strict liability. There's no question that Illinois courts have also been emphatic that strict liability does not mean absolute liability. And that's why we have to use the rubric that the court's given us in analyzing exactly what plaintiff's burden is in this case. Plaintiff did not meet that burden in this case. And that's why summary judgment was properly granted. I want to start quickly just with a very short reminder about what exactly the plaintiff needs to establish. First, the injury complained of resulted from a condition of the product. Second, that the condition was unreasonably dangerous. Third, that the condition existed at the time the product left the manufacturer's control. Three things. Three, the plaintiff needs to establish that there are disputed issues of material fact as to each of those three elements. Otherwise, summary judgment is properly entered for the defense. And that's what happened in this case. There is not a disputed issue of fact about each of those three required elements. Therefore, summary judgment is proper. So what he's saying, I mean, his only argument now is manufacturing defect, right? That's right. That would have to do with when it left the manufacturing facility, there's something wrong. That's the only argument that we're discussing here, right? There are two actually, Justice Hyman. First, the plaintiff can't establish that the condition was unreasonably dangerous. And that speaks to every question you've been asking the opposing counsel about things like, was there any sort of abuse? Was there any sort of abnormal use of the product? Are there any reasonable secondary causes? That speaks to that second element, unreasonably dangerous. The third is equally problematic for the plaintiff. And that's the question of, did the condition exist at the time the product left the manufacturer's control? There's no evidence of that either. So let's talk first about whether the condition was unreasonably dangerous. In this particular case, it's taken until this argument to be clear exactly what the legal analysis being used is. What's the allegation? It's not a defective design defect. That hasn't been clear until now. Now it's clear. We're talking about a manufacturing defect. And more specifically, we're talking about an unspecified manufacturing defect. Fine. That leads us to the analysis that the court was just discussing. Nonspecific defect. We know in that situation, the plaintiff needs to establish with circumstantial evidence. Again, you need some evidence just to get past this specific thing, that the product failed to perform as expected in light of its nature and intended function, that the product was not being used abnormally, and that there were no reasonable secondary causes of failure. There is no evidence from the plaintiff that supports either an absence of abnormal use or an absence of reasonable secondary causes. And at this point, Justice Hyman, I have to say you stole all of my quotes that I had taken directly out of the record because that's what Mr. Newquist specifically conceded. He does it throughout his deposition. Pages 1483, page 1486, page 1487, he concedes it would be an unsafe practice to climb a ladder in excess of the duty rating. He concedes someone who climbs a ladder with a 300-pound duty rating like this one is overloading the duty rating on the ladder. At that point, there is abnormal use. It's been important to note because plaintiff's counsel kept discussing the idea of the ANSI standards, Mr. Newquist was asked and there was some discussion about the idea of a static load versus a dynamic load. And I don't pretend to understand physics at all, but I do understand that that's the distinction we're talking about when we look at a duty rating versus something like an ANSI standard. Here what the court focuses on is what is the duty rating for this ladder? It's undisputed the duty rating was 300 pounds. Did Mr. Pike weigh more than 300 pounds? Justice Patinsky, as you have just emphasized, that's been conceded. Yes, Mr. Pike weighed about 350 pounds. Did he use the ladder? Yes. That's abnormal use. Right there, the defendant was entitled to summary judgment. But we don't even need to rely on that. We can move on to the question about were there any reasonable secondary causes in this case? And the answer to that once again is absolutely there were potential reasonable secondary causes that could have caused the ladder to fail the way it failed in this case. And again, Mr. Newquist gives us that. This is at page 1515 in the record in his deposition transcript. The ladder has two years of use. And when he's asked, what does that mean? He says, well, you know, there's wear and tear on the ladder. You know, issues can come up as cracks in those two years. That has nothing to do with the manufacturer. That has everything to do with the ladder, the way it was used and the age of the ladder. That is a reasonable secondary cause for why the ladder may have failed. There's testimony even beyond this, both from Mr. Pike himself and from Mr. Newquist about the context in which this ladder was being used at McCormick Place who were doing things like building displays at issue here and taking them down. Even Mr. Pike says, I've seen in his, this is now to be clear, this is from his deposition at pages 1561 to 62, but he's talking about the statement that he gave after his incident. And in the statement that he gave after the incident, he says there was a crack at the base of ladder. I've seen those kinds of cracks before on ladders. Usually what happens is because most ladders are transported horizontally, forklifts or crates, or they get, you know, pushed in by other crates, that's usually where it cracks toward the bottom. That's very straightforward, clear evidence of a reasonable secondary cause in this case. And Mr. Newquist absolutely agrees. At page C1518, he says he has witnessed forklift damage to ladders in these types of situations himself. None of that is disputed. The only dispute that plaintiff raises is by arguing that according to the plaintiff, he was using the ladder correctly at the time of the incident. But that does not establish dangerous, that the product was unreasonably dangerous. And then last but not least, we look at this third required element about the condition of the product at the time it left the manufacturer's control. And once again, we go straight back to Mr. Newquist. Mr. Newquist conceded that there is nothing in the record that he can point to that says the ladder was in the same condition at the time it left the manufacturer's control. He says the opposite. This is at page C1515. Do you have any way of knowing if the ladder was in the same condition at the time of the accident as when it was originally sold? Answer, no. Of course it isn't. It's not in the same condition. That concedes the plaintiff's case. On that alone, but for all of the reasons we've already discussed, the trial court properly granted summary judgment in this case, and it should be affirmed. If the court has no further questions. Any questions? Mr. Lynch? Mr. Lynch, we can't hear you. Mr. Lynch. I'm sorry, Your Honor. Counsel has stunned me silent. I apologize. You're muted now, Justice Hyman. I was only going to say that you've never been stumped before. Well, I appreciate that, Your Honor. To get back to, I think it was mostly Justice Coughlin's question. It's the record, page 1571. It's page 144 of Mr. Pike's deposition. He estimated his weight to be 305 or 310 pounds as of the date of the accident. Yes, that's still over 300 pounds. I think it's foreseeable. I think that still creates a fact question. I think even if he's 350 pounds, there's a fact question. I think that's reasonably foreseeable that someone that weight would use it. And I did confirm, as to Justice Paczynski's question, the statement of facts on page seven just says that Carlos weighed over 300 pounds at the time. So I think that's still consistent. Again, the primary argument is even a 350-pound man using this ladder that should be able to hold a 500-pound man, that is not a reasonably safe product. As to the point that counsel made at the very beginning of her argument about strict liability not being absolute liability, that's true. But that's also a question for the jury. The jury is the one who gets all the facts and decides, are we comfortable with this product and how it performed under these situations, or do we think there should be liability? It's the jury that decides, was the product unreasonably dangerous? And then finally, as to Mr. Newquist's testimony, I think it's important to keep that in the context that he was retained and testified as an ANSI and OSHA standards expert. He was not retained to give testimony really concerning the ladder itself as it relates to this defendant, but to really the document retention issue and those standards. So I think his testimony has to be in that context. The law is that your experts' admissions are not binding against you. And so I think in the context of what he was retained and his area of expertise, you know, that needs to be kept in mind when addressing some of his testimony. I do think fact questions exist. I think that juries were meant to resolve these questions. I would ask your honors to reverse. Any questions? No. Well, then, Mr. Lynch, Ms. Weiler, I would like to thank you very much for your excellent briefs and your excellent argument. We will take this case under consideration and issue an order and enforce it. And this case is adjourned. Thank you. Thank you, your honors. Thank you, counsel.